552 F.2d 482
 BRITISH AMERICAN COMMODITY OPTIONS CORP. and Lloyd, Carr &
Co., Plaintiffs- Appellants-Cross Appellees,
v.
William T. BAGLEY, Chairman of the Commodity Futures Trading
Commission, et al., Defendants-Appellees-Cross Appellants.
NATIONAL ASSOCIATION OF COMMODITY OPTIONS DEALERS, a
non-profit association, et al.,
Plaintiffs-Appellants-Cross Appellees,
v.
The COMMODITY FUTURES TRADING COMMISSION et al.,
Defendants-Appellees-Cross Appellants.
 Nos. 863, 864, 865, Dockets 77-6010, 77-6011 and 77-6019.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 9, 1977.
Decided April 4, 1977.
 
 Charles J. Hecht, New York City (Haig Costikyan and Gusrae, Greene & Kaplan, David Greene, Martin Kaplan, New York City, on the brief), for plaintiffs-appellants-cross appellees British American Commodity Options Corporation and Lloyd, Carr & Co.
 Leonard R. Goldstein, College Park, Md., for plaintiffs-appellants-cross appellees National Association of Commodity Options Dealers, Bristol Options, Inc., Chartered Systems Corporation, Cleary Trading Company, Inc., First New York Commodity Options, Inc. of Los Angeles, Williston Corporation and International Commodity Options, Ltd.
 Frederic T. Spindel, Washington, D. C. (Richard E. Nathan, Acting Gen. Counsel, Commodity Futures Trading Commission, Washington, D. C., and Virginia F. Crisman, Omaha, Neb., on the brief), for defendants-appellees-cross appellants The Commodity Futures Trading Commission, William T. Bagley, John V. Rainbolt, II, Gary Seevers, Read P. Dunn and Robert L. Martin.
 Before FEINBERG, GURFEIN and MESKILL, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Nine commodity options dealers and the National Association of Commodity Option Dealers (NASCOD) in this consolidated action challenge new rules that regulate the commodity options industry. The Commodity Futures Trading Commission (Commission) promulgated the rules under authority granted in 1974 by the Commodity Futures Trading Commission Act, Pub.L. 93-463, 88 Stat. 1389, 7 U.S.C. §§ 1-22 (Supp. V, 1975). Plaintiffs claim that the regulatory scheme violates various requirements of the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. (1970), and the United States Constitution. Prior to the effective dates of the new rules, plaintiffs brought suit in the federal courts[1] for declaratory relief, and moved for a preliminary injunction against implementation of the rules. With the certified record of the informal rule-making proceeding before him, Judge Whitman Knapp of the United States District Court for the Southern District of New York enjoined the regulation that required segregation of customers' funds, but otherwise denied plaintiffs' motion and granted summary judgment for the Commission. We reverse the injunction against the segregation rule, and in other respects affirm the judgment of the district court.
 
 
 2
 * The Commodity Options Industry
 
 
 3
 The commodities business operates as a marketplace of contracts. The contracts traded are for the purchase, or sale, of specific amounts of a commodity[2] either that have already been produced, or that will be produced in the future and delivered by a specific date. This latter group of contracts are known as "commodity futures."[3] A "commodity option" is a contractual right to buy, or sell, a commodity or commodity future by some specific date at a specified, fixed price, known as the "striking price."[4] A contract entitling its owner to purchase the commodity is known as a "call," and a contract entitling its owner to sell is called a "put." In the plainest case, an option is created, or "written," by the owner of a commodity or commodity futures contract, who commits himself to sell his goods or contract. But an option can also be written by anyone else willing to take the chance that he will be able to cover his obligation in the futures market, if the option purchaser decides to exercise the option. Such an option is described as "naked."
 
 
 4
 The plaintiff firms in this case deal in "London options," which are options on futures contracts for certain commodities that are traded in London, England, on either the London Metals Exchange (LME) or several other exchanges whose transactions are cleared through the International Commodity Clearing House (ICCH). The plaintiff firms sell London options in the United States and, according to plaintiffs British American Commodity Options Corp. and Lloyd, Carr & Co., operate as follows: Plaintiffs actively solicit customers through direct mail and telephone contacts, as well as by newspaper and television advertising. When a customer orders the purchase of a commodity option, the dealer furnishes him with a notice giving the details of the transaction including the nature of the underlying futures contract, the price the writer charges for the option, known as the "premium," the dealer's commission, and the market on which the trade will be executed. The customer may or may not have paid for the option when this notice is sent; only payment of the purchase price to the dealer commits the customer to buying the option. The price quoted in the notice is firm, however, for five days, which means that the dealer assumes the risk of a price increase during that period. Once the dealer receives cash payment, he executes the trade through a "clearing member" of one of the English exchanges. The dealer then immediately forwards the premium amount to the clearing member, who pays the option writer. At the same time, the dealer sends another notice to the customer giving final details of the transaction.[5]
 
 
 5
 To profit from this purchase, the customer must exercise the option before it expires. Exercising the option means buying the underlying futures contract. Since the customer normally has no interest in actually receiving the commodity on the delivery date, the clearing member then sells a futures contract short for the customer. The difference between the price at which the option is exercised plus the cost of purchasing the option (premium and commission) and the price at which the futures contract is sold is the customer's profit. If, however, the market price for the futures contract has dropped below the striking price, the customer allows the option to expire, in which case he loses his entire investment.
 
 Market Regulation
 
 6
 Intimations of difficulties in the commodity options market came to the attention of Congress in the early 1970's; existing laws had not worked well in preventing abuses in the options industry.[6] Options were an especially hospitable environment for abuse because a naked option could be created out of nothing, if the writer was willing to run the risk of not covering his obligation by acquiring an offsetting position in the futures market. Thus, entry into the business of options required little capital. In addition, options bear lower price tags than the futures contracts underlying them, so the options market may be peculiarly attractive to individual investors of relatively modest means and with a propensity for taking risks.
 
 
 7
 Before 1974, regulation of trading in commodity futures and options derived mainly from the Commodity Exchange Act, 7 U.S.C. §§ 1-17b (1970).[7] That Act empowered the Commodity Exchange Authority of the Department of Agriculture to administer certain limited regulations on trading in a number of agricultural commodities,[8] and completely banned options on them. 7 U.S.C. § 6c (1970). On October 23, 1974, Congress enacted the Commodity Futures Trading Commission Act, supra, which created the Commission as an independent regulatory agency with plenary rulemaking power. The Act also substantially broadened the field of regulation, to include virtually all "goods and articles," see note 2, supra.[9] The Commission was given
 
 
 8
 exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving contracts of sale of a commodity for future delivery.
 
 
 9
 7 U.S.C. § 2 (Supp. V, 1975).
 
 
 10
 The new Act perpetuated the old Act's absolute ban on option trading for the commodities listed in the old Act, 7 U.S.C. § 6c(a) (Supp. V, 1975), but permitted other options to be written and to trade in compliance with rules promulgated by the Commission. 7 U.S.C. § 6c(b) (Supp. V, 1975). The Act authorized the Commission "to make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of this chapter." 7 U.S.C. § 12a(5) (Supp. V, 1975).
 
 
 11
 On April 25, 1975, soon after the Commission came into official existence, it published for public comment a proposed anti-fraud rule, 40 Fed.Reg. 18187 (1975), that broadly proscribed fraudulent and deceptive practices and the making of false statements in connection with commodity options transactions. The anti-fraud rule became effective June 24, 1975. The Commission explained that its swift action was necessary because the Act's grant of exclusive jurisdiction to the Commission had left the public without regulatory protection.
 
 
 12
 In October 1975, the Commission announced that it was considering rules to regulate or prohibit all options trading. The Commission also announced the appointment of an Advisory Committee on the Definition and Regulation of Market Instruments[10] to study the options situation and recommend suitable regulations. The public notice solicited suggestions of temporary rules to be adopted, and offered for consideration a number of alternative approaches: prohibition of all commodity options transactions; restricting options trading to established contract markets; allowing trading only of options written as part of a Commission-approved "business plan"; prohibition of "naked" options; or registration by the Commission of dealers who comply with certain Commission fiduciary requirements. 40 Fed.Reg. 49360-62 (1975). The Commission did receive some comments from the public, although apparently none from any plaintiff.
 
 
 13
 On February 20, 1976, the Commission published its proposed temporary rules to govern commodity options transactions. 41 Fed.Reg. 7774 (1976). The proposal called for all options dealers, among other things, to register with the Commission, to maintain at least $100,000 of working capital, to keep certain records, and to disclose to options customers that certain information about the options dealer could be obtained from the Commission. Notably absent from the proposal was any requirement that the dealer set aside, or "segregate," any portion of the customer's cash payment until the option is sold or exercised. The Commission did, however, indicate that it was "particularly interested" in comments on the wisdom of such a requirement. 41 Fed.Reg. 7776 (1976).
 
 
 14
 At an oral hearing in March 1976, the Commission received the views of various witnesses, including counsel for British American. The Commission also received written comments, some supporting segregation, and in July 1976, the Advisory Committee transmitted its report, which also supported segregation.
 
 
 15
 On October 8, 1976, the Commission published proposed interim regulations, intended to become effective on November 22. Written comments from the public were invited on or before November 8. British American submitted comments and requested oral hearings, which the Commission did not provide. The Commission adopted the regulations, substantially in the form it had proposed, on schedule and gave public notice on November 24, 41 Fed.Reg. 51808 (1976), but delayed effectiveness for 15 days, except that the segregation requirement was delayed 30 days.
 
 
 16
 The new rules forbid an option dealer to do business after January 17, 1977 unless he is registered as a "futures commission merchant" (FCM) under the Act. 17 C.F.R. § 32.3 (1976). To be registered, a dealer has to comply with a new minimum capital requirement, 17 C.F.R. § 1.17 (1976), that the dealer maintain adjusted working capital in excess of the greater of $50,000 or a formula figure, one of whose components is five percent of the dealer's aggregate indebtedness. The new disclosure rule, 17 C.F.R. § 32.5 (1976), requires the option customer to be furnished a "summary disclosure statement" prior to the commodity option transaction. The statement must contain, among other things, a brief description of the "total quantity and quality" of the commodity under the option, its duration, the elements comprising its purchase price, the method by which the striking price is established, the amount of the commission to be charged, a statement that the price rise (for a call) or price fall (for a put) must exceed the premium amount plus costs in order for the option customer to make money, and a clear explanation of the possible effects of currency fluctuations on options executed through foreign facilities. Section 32.6 of the new regulations requires an FCM to segregate 90 percent of the payment received from the customer in a United States bank account until expiration or exercise of the option. Also, the rules require an FCM to keep pertinent records of each transaction. 17 C.F.R. § 32.7 (1976).
 
 
 17
 The new rules announced on November 24 differed in several respects from the October 8 version. In addition to postponing the effective dates, as indicated above, the new rules relaxed the earlier proposed requirement that the summary disclosure statement be furnished no less than 24 hours before the transaction. The Commission changed this requirement to allow the statement to be furnished merely "prior" to the transaction, because of public comments that the proposed rule was unrealistic in light of the volatile nature of the commodities markets. In addition, the new rules change the requirement that particularized price information be disclosed before rather than after the transaction. And the amount to be segregated was reduced from 100 percent to 90 percent so that an FCM could immediately get funds for commissions, salaries, and administrative expenses. See 41 Fed.Reg. 51811-13 (1976).
 
 
 18
 As indicated above, plaintiffs' efforts in the district court to enjoin operation of the new rules were unsuccessful, except for the segregation requirement. Except for that portion of the order, plaintiffs urge us to reverse the judgment of the district court. The Commission cross-appeals and seeks reversal of the injunction against the segregation requirement.
 
 II
 Procedural Claims
 
 19
 Plaintiffs claim that the regulations were adopted in violation of the rulemaking notice provision of the Administrative Procedure Act, 5 U.S.C. § 553 (1970). The regulatory scheme was published in final form only 15 days before most of it became effective. Plaintiffs argue that this waiting period was impermissibly short under § 553(d), which provides that "the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except . . . (3) as otherwise provided by the agency for good cause found and published with the rule." The statutory hiatus, plaintiffs assert, allows interested parties a chance to participate meaningfully in the rulemaking process, and enables the agency to educate itself properly. Where, as here, both the system of rules and the agency itself are newly created, this rationale is particularly compelling. Moreover, two plaintiffs charge the Commission with purposeful evasion of the procedural requirement. They claim that the November 24 publication came as a direct response to their November 15 filing of a complaint against the rules in the federal district court, and that since the Commission had indicated that oral hearings on the October 8 proposal would be held sometime in December, the Commission thus actively deterred the firms from participating in the rulemaking process during October and early November. Finally, plaintiffs appear to claim that in any event some sort of oral hearing before the Commission after October 8 was required before the new rules could be issued.
 
 
 20
 Fairly characterized, however, the Commission's procedures adequately complied with statutory requirements and did no substantial injustice to the plaintiffs. The Commission first published notice of its plan to promulgate regulations in October 1975. The first specific proposal was released on February 20, 1976, and in March oral hearings were held. After consideration of the views there expressed and of the report of the Advisory Committee, the Commission on October 8, 1976 announced its revised proposal, which was finally adopted in substantially the form then proposed. Notwithstanding the language of § 402 of the new Act, 7 U.S.C. § 6c(b), which provides that "any . . . order, rule, or regulation may be made only after notice and opportunity for hearing," no oral hearing was required after October 8. United States v. Florida East Coast Ry. Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). Nor did the Commission announce that there would be one, as some of the plaintiffs imply. With respect to the time period, plaintiffs appear to argue that the changes between the October 1976 proposal and the final rules announced on November 24 were sufficient to trigger a new 30-day wait. We doubt this, see Chrysler Corp. v. Department of Transportation, 515 F.2d 1053, 1061 (6th Cir. 1975); California Citizens Band Association v. United States,375 F.2d 43, 48-49 (9th Cir. 1967), and we note that all the changes appear to have relaxed the requirements for the plaintiff firms. But in any event, the Commission was not required to delay effectiveness another 30 days if "good cause" for acceleration was "found and published with the rule." The November 24 announcement declared the following:In order to assure full and fair consideration of the various proposals that have been made over the many months in which option regulations have been considered, it has not been possible to implement appropriate regulations before now. That consideration having now been completed, however, the Commission finds that the public interest requires that the foregoing rules be adopted without any further delay inasmuch as the public has been without the protection of a comprehensive regulatory program in an area which historically has been fraught with abuses. Moreover, there has been ample notice and public participation in this rule-making proceeding and affected persons have had adequate notice and opportunity to comment on the subject of these rules and the issues involved in their consideration, as well as the terms of the rules themselves substantially as adopted. Furthermore, affected persons have had an adequate opportunity, through prior notices, to take the necessary steps to be in full compliance with the rules by the effective dates thereof.
 
 
 21
 We agree with Judge Knapp that this statement was adequate to satisfy the requirement of § 553, especially since plaintiffs have made no showing of prejudice to them from the 15-day acceleration of the effective date of the new rules. They had ample time both to participate in the rulemaking process and to ready themselves to comply with the rules whose effective date the Commission accelerated. And the segregation requirement, about which plaintiffs complain the most, was delayed for 30 days after November 24.
 
 Segregation
 
 22
 As already indicated, Judge Knapp granted a preliminary injunction against the new segregation requirement. 17 C.F.R. § 32.6 (1976). That section requires that 90 percent of the customer's money be retained in an American account until performance under the option contract is complete. But the London exchanges, which allegedly maintain their own systems of customer safeguards, must simultaneously be sent that portion of the customer's money that represents the premium amount. Thus, the American options dealer must himself have the funds to place a major portion of the price of the option he sells in a segregated account. British American estimates that this "double segregation" burden will require it to raise several million dollars in capital, which may be impossible for it. Moreover, plaintiffs argue, such strangulation of the industry is manifestly unnecessary in light of the London exchanges' own system of financial safeguards.
 
 
 23
 The Commission was not unmindful of these considerations. The October 8, 1976 notice took account of the possibility of heavy capital demands on dealers in London options, and invited suggestions of alternatives. But the Commission stressed then, and repeated in the November 24 publication of the rules as adopted, that its primary purpose was to protect customers' money from the sort of abuses that have plagued the field.[11] The Commission looked warily at safeguards allegedly implemented abroad, noting that "assets (segregated in the United States) will not be subject to the attachment or other laws or requirements of any other nation." 41 Fed.Reg. 44564 (1976). Evidence in the record raised serious questions about whether the English safeguards would effectively protect the American customer. At the Commission's March 1976 oral hearing, counsel for British American in effect conceded that the London guarantees do not run to options customers in the United States. Moreover, stringent controls on the use of customers' money are particularly sensible in an industry, such as commodity options trading, that attracts some thinly capitalized firms. In the absence of such protection, a need for capital might prod a dealer into over-dependence on customers' money to finance general operations. In that event, if some difficulty should arise in the chain of transactions needed to generate a profit for the customer seeking to exercise his option, he might be left without a readily available source for recoupment of his investment. Thus, the very point plaintiffs raise to challenge the wisdom of requiring domestic segregation their financial vulnerability argues strongly for the requirement. And the Commission has pointed out that financially stable firms may be able to meet the capital demands of segregation by borrowing, and using the interest they can obtain on the segregated funds to defray a good part of the cost of borrowing.
 
 
 24
 Judge Knapp noted that the scheme of regulations as originally proposed in February 1976 had no segregation requirement, and he saw no reason for its hasty addition. He concluded that the preliminary injunction would not adversely affect the public interest, and that "plaintiffs have a reasonable likelihood of success in establishing that defendants acted arbitrarily and capriciously in imposing segregation requirements."[12] He looked to the prospect that the plaintiff firms "could not long remain in business" if required to segregate as one indication that the requirement might be unreasonable.
 
 
 25
 On the basis of the Commission's justifications and the record before us, we disagree with the district court that the segregation requirement should be enjoined. The Commission's conclusion that in light of past abuses, the public now needs this minimal protection carries great weight. And in any event, the requirement is not unreasonable even if it threatens to restrict participation in the industry to soundly capitalized firms.[13] Nor does it appear that the Commission adopted the requirement with undue haste. The Commission first publicly raised the possibility of segregation in October 1975, although at that time no regulations were put forward. The February 20, 1976 notice again broached the subject. 41 Fed.Reg. 7776. Although the proposed rules published then did not call for segregation, the Commission did request comments on the idea, and in July 1976, the Advisory Committee publicly recommended segregation. Furthermore, the February 1976 proposal had more stringent net capital requirements and apparently compelled the dealer to maintain in the United States assets sufficient to cover not only its customers' investments but also even the unrealized gains on the customers' options. 41 Fed.Reg. 7783-84 (1976).[14] When in October 1976 the Commission's new proposal relaxed the net capital requirements, the segregation rule that replaced it was by no means a complete surprise. The Commission had, with the aid of public participation, been considering it for almost a full year. Nor did the Commission's examination of the segregation rule cease with publication of the October 8 proposal. That version required 100 percent segregation, but the Commission reduced that figure to 90 percent in the final rule.
 
 
 26
 We conclude, therefore, that the Commission's decision to impose a segregation requirement was a reasonable exercise of its discretion in an effort to protect the public, and that the Commission's analysis of the problem and alternative solutions was adequately deliberate. We hold that the district judge erred in granting plaintiffs a preliminary injunction against the segregation requirement.
 
 Registration
 
 27
 Under 17 C.F.R. § 32.3 (1976), all commodity options dealers must register with the Commission by January 17, 1977. Plaintiffs attack the requirement on several grounds: (1) the Commission's position that it could not assure applicants that their filings would be processed by the deadline unless filed by December 27 was unreasonable because Judge Knapp only upheld the regulations on December 21; (2) the regulation's structure requiring registration by January 17, 1977 rather than filing vests the Commission with unbridled discretion to exclude any applicant from the options business simply by not acting on the application for registration; (3) section 32.3 conflicts diametrically with 17 C.F.R. § 1.19 (1976): the former requires options dealers to register as FCM's, and the latter section forbids FCM's to "make, underwrite, issue, or otherwise assume any financial responsibility for the fulfillment of, any (option transaction)."
 
 
 28
 Plaintiffs' first two arguments are in essence that the Commission acted high-handedly in proclaiming the January 17 deadline. Especially since the agency confronted a previously unregulated field, plaintiffs stress, it should have made conscientious efforts to avoid unnecessarily disrupting the industry. We agree that the laudable intent to protect the public cannot give regulators unbridled freedom to do as they wish. Viewing the Commission's conduct here as a whole, however, we do not believe that there was substantial injustice or gratuitous disruption. Plaintiffs did have reasonable advance notice that registration would be required and could not rely on the possible success of their lawsuit as an excuse for not being prepared to file. Moreover, the Commission has not dragged its feet on the applications filed. After oral argument, the Commission advised us by letter that it had not yet acted on the filings of only two of the plaintiff firms, both of which had filed during January. Three other plaintiffs remain unregistered, but they are the subjects of administrative proceedings brought by the Commission to determine whether registration should be refused. Under the circumstances, the attack on the registration requirement must fail.
 
 
 29
 Similarly, there is no merit to the argument that § 32.3 may conflict with § 1.19 and thereby, in effect, preclude plaintiffs from engaging in the commodity option business. The American firms dealing in London options operate solely as agents, a role the Commission has not deemed to constitute an assumption of "financial responsibility" barred by § 1.19. British American and Lloyd, Carr urge that the Commission "can always take the position that since the retail London commodity options dealers are responsible for transmitting customer funds to and from London they 'otherwise assume financial responsibility,' "[15] thereby violating § 1.19. However, as long as the Commission construes its own regulations consistently, plaintiffs' claim is devoid of merit. If the Commission acts inconsistently and we do not assume or suggest that it will plaintiffs have shown that they know how to go to court to protect their rights.
 
 Disclosure
 
 30
 Implementation of the disclosure requirements in the new regulations correlates with a decline in options sales for plaintiffs. For example, British American tells us that its gross options premiums per month dropped from $2,238,748 in November 1976 to less than $1 million in December. Net income from options simultaneously fell off sharply. British American attributes this decline to the Commission's "severe" and "punitive" requirements which seriously disadvantage options dealers in competition with dealers of futures contracts or stock options. They further argue that it is unfair not to make the requirements also applicable to traders only of futures since the customer takes a greater risk in a futures transaction: A futures customer may be subject to margin calls, whereas the commodity options customer, who pays the full premium in cash, cannot be.
 
 
 31
 We do not doubt that full disclosure of commissions and fees and a clear statement of what must happen before the customer makes money from his option cool the public's ardor for options. But the Commission concluded that such disclosure is an effective way to help the public make informed investment decisions. We cannot say that this judgment was arbitrary or irrational. Indeed, it seems sensible; the very fact that the disclosures have so drastically affected plaintiffs' business supports the Commission's position. As for the comparative leniency of disclosure requirements for futures and stock options,[16] the Commission was entitled to rely on the added supervision of those markets,[17] and the extensive disclosures required from the issuers of the securities that underlie stock options.
 
 Minimum Financial Requirements
 
 32
 Plaintiffs also attack the minimum capital requirement for FCM's, 17 C.F.R. § 1.17 (1976), as arbitrary, capricious, and unreasonable. Plaintiffs complain that the $50,000 minimum is arbitrarily pegged at five times the minimum requirement for commodity futures dealers, even though futures trading involves much greater sums of money than options trading. Furthermore, plaintiffs argue, the definition of "aggregate indebtedness" in § 1.17 pits the dealer's interest against that of his clients by requiring the dealer "to take a 5% 'haircut' on customers' equity."[18] By this plaintiffs mean that as the value of a customer's option goes up (if that happens), the dealer's indebtedness to the customer is deemed to rise simultaneously so the dealer must augment his working capital by 5 percent of the increase.
 
 
 33
 With respect to the $50,000 minimum, the Commission explained in its November 24 notice: "Based on its experience, . . . the Commission believes that the distinction in working capital requirements between futures commission merchants who are engaged in options activity as opposed to those who are not, is necessary to provide a cushion against losses which are more likely to arise in the commodity options area." 41 Fed.Reg. 51813 (1976). In support of its position, the Commission points out that a FCM dealing only in futures contracts must reassess its position on a daily basis in light of unrealized gains and losses on its customers' contracts. Also, industry self-regulatory organizations, which monitor futures dealers, can detect early signs of a firm's financial instability. We cannot say that the Commission's judgment was arbitrary.
 
 
 34
 Regarding the inclusion of customers' equity as part of aggregate indebtedness, there has been some confusion among the parties as to precisely what the requirement is. In affidavits filed with the district court on December 3, 1976, and with this court on January 13, 1977, counsel for British American indicated that the difficulty had arisen from conflicting agency interpretations of the requirement. On December 1, 1976, the Acting Branch Chief of the Commission's Eastern Regional Office wrote to Crown Colony Options, Ltd., that the "haircut" was required by § 1.17. Yet on December 3 the Commission's auditing staff began applying a policy of not requiring the "haircuts" when the FCM acts solely as an agent. And in this court the Commission has again conceded that unrealized gains on options contracts will not be treated as amounts payable to customers for purposes of the net capital computation. With the Commission's position thus clarified, plaintiffs' claim evaporates.Other Claims
 
 
 35
 NASCOD argues that the record-keeping requirements in § 32.7 may be unnecessary, especially the requirement that the FCM maintain a list of all prospective commodity option customers to whom solicitations are directed. We accept the Commission's justification that
 
 
 36
 This provision imposes no greater burden than placing a check mark next to the name and address of the customer on the solicitation list utilized. Moreover, the Commission believes that this information, as well as its books and record-keeping requirements generally, will assist in the Commission's monitoring of the activities of persons offering commodity option transactions for compliance with the interim rules.
 
 
 37
 41 Fed.Reg. 51813 (1976).
 
 
 38
 Plaintiffs claim throughout that the district court erred in granting summary judgment because issues of material fact remained unresolved. In sum, we are told that "genuine material questions of fact were raised concerning whether the Commission acted arbitrarily and capriciously."[19] But it is quite clear, as we have already held, that the Commission's actions were not arbitrary or capricious. If plaintiffs' contention is that the district court was required to hear new evidence on the justification for the regulations issued by the Commission, we do not agree. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414-15 (1971). Plaintiffs have also advanced other arguments, which we have considered and found to be without merit. Accordingly, the judgment of the district court is affirmed except for the grant of injunctive relief against the segregation requirement, and as to that portion of the order we reverse.
 
 
 
 [1]
 Plaintiffs British American Commodity Options Corp. and Lloyd, Carr & Co. sued in the United States District Court for the Southern District of New York on November 15, 1976, No. 76, Civ. 5124. NASCOD and other plaintiffs filed initially in the United States District Court for the District of Columbia, No. 76, Civ. 2250. Upon learning that the same issues had been presented in New York, the plaintiffs in the D.C. action appeared in New York on December 10, 1976 and argued the motions that led to the instant appeal. The D.C. district court granted a change of venue four days later, and Judge Knapp in New York granted a motion to consolidate the two actions
 
 
 [2]
 The Commodity Futures Trading Commission Act, 7 U.S.C. § 2 (Supp. V, 1975), defines "commodity" as
 wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions as provided in section 13-1 of this title, and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in . . . .
 
 
 [3]
 For general descriptions of the market's operation, see R. Teweles, C. Harlow & H. Stone, The Commodity Futures Game (1974); Horn, Commodities, in The Stock Market Handbook 307-15 (F. Zarb & G. Kerekes eds. 1970). See also Johnson, The Perimeters of Regulatory Jurisdiction under the Commodity Futures Trading Commission Act, 25 Drake L.Rev. 61 (1975), which describes the shift in emphasis of commodity regulation from farm interests to investor protection, and Smith, Commodity Futures Trading, 25 Drake L.Rev. 1 (1975)
 
 
 [4]
 For a fuller description of commodity futures options and their uses as investment tools, see S. Kroll & I. Shisko, The Commodity Futures Market Guide 258-68 (1973)
 
 
 [5]
 See Long, Commodity Options Revisited, 25 Drake L.Rev. 75, 111-128 (1975), for an excellent description of the London options market and the sale of London options in the United States
 
 
 [6]
 H.R.Rep. No. 93-975, 93d Cong., 2 Sess. 36-53 (1974)
 
 
 [7]
 Attempts to invoke the securities laws in this context have met with only mixed success. Compare Continental Marketing Corp. v. SEC, 387 F.2d 466 (10th Cir. 1967), with Glazer v. National Commodity Research and Statistical Service, Inc., 547 F.2d 392 (7th Cir., filed Jan. 7, 1977). See generally 1 A. Bromberg, Securities Law: Fraud 82.241-69 (1975); Long, supra note 5
 
 
 [8]
 7 U.S.C. § 2 (1970) provided, in pertinent part:
 The word "commodity" shall mean wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, onions, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice.
 
 
 [9]
 Onions were excepted, in accordance with Pub.L. 85-839, 72 Stat. 1013 (1958), which prohibited all trading in onion futures. Congress took this action after onion producers reported that price variations in the futures market had been adversely affecting the cash price of onions. See S.Rep. No. 1631, 85th Cong., 2d Sess. (1958); H.R.Rep. No. 1036, 85th Cong., 1st Sess. (1957), reprinted in (1958) U.S.Code Cong. & Admin.News, pp. 4210-4215
 
 
 [10]
 The Committee was composed of seventeen members. It included various industry leaders, exchange officials, economists, attorneys, the Illinois securities commissioner, a farmer-rancher, a consumer representative, and two members of the Commission, one of whom served as the Committee's chairman
 
 
 [11]
 See, e. g., SEC v. Continental Commodities Corporation, 497 F.2d 516 (5th Cir. 1974); SEC v. Univest, Inc., 405 F.Supp. 1057 (N.D.Ill.1976). See also H.R.Rep. No. 93-975, supra note 6
 
 
 [12]
 We agree with Judge Knapp that the proper test to apply was the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A). National Nutritional Foods Association v. Weinberger, 512 F.2d 688, 700-01 (2d Cir.), cert. denied, 423 U.S. 827 (1975)
 
 
 [13]
 Indeed, the rulemaking power vested in the Commission by Congress allows the possibility that the Commission might ban options transactions altogether. 7 U.S.C. § 6c(b) (Supp. V, 1975)
 
 
 [14]
 The February proposal required the dealer to maintain $100,000 in net working capital. Moreover, the proposal required computation of net working capital as of the close of each business day, in accordance with a prescribed method designed to take into account the exposure that a commodity option dealer might experience "should the market move against the dealer and in favor of a purchaser." See 41 Fed.Reg. 7778 (1976). This approach was tailored to a market in which a dealer was allowed to both write and sell options. By October, the Commission had decided against allowing dealers to write options. 41 Fed.Reg. 44560 (1976)
 
 
 [15]
 Brief of appellants British American and Lloyd, Carr at 40
 
 
 [16]
 Stock options trading is regulated by the Securities and Exchange Commission, not by the Commodity Futures Trading Commission
 
 
 [17]
 For a summary of regulation of futures trading and commodity futures exchange activities under the new Act, see Smith, supra note 3, at 33-44
 
 
 [18]
 Brief of appellants British American and Lloyd, Carr at 44
 
 
 [19]
 Brief of appellants NASCOD, et al. at 10