Robert MYRON, Alan Freeman, Leslie Rosenthal and Richard Mortell, co-partners doing business as Rosenthal & Company, Petitioners,

v.

Alfred HAUSER, Respondent,

Commodity Futures Trading Commission, Respondent.

No. 80–1954.

United States Court of Appeals, Eighth Circuit.

Submitted June 18, 1981.

Decided March 17, 1982.

Rehearing and Rehearing En Banc Denied April 28, 1982.

Ronald L. Simon, Minneapolis, Minn., for respondent Hauser.

John G. Gaine, Gen. Counsel, Pat G. Nicolette, Deputy Gen. Counsel, Gregory C. Glynn, Associate Gen. Counsel, Mark D. Young, Sp. Counsel, Charles R. Mills, Atty., Commodity Futures Trading Com'n, Washington, D.C., for respondent Commodity Futures Trading Com'n.

L. Clinton Burr, Rosenthal & Co., Chicago, Ill., for petitioners.

Ralph Mantynband, Chicago, Ill., for respondents; Arvey, Hodes, Costello & Burman, Chicago, Ill., of counsel.

Before HENLEY and McMILLIAN, Circuit Judges, and COLLINSON,* Senior District Judge.

McMILLIAN, Circuit Judge. .

Petitioners Robert Myron, Alan Freeman, Leslie Rosenthal, and Richard Mortell, who do business as partners under the name Rosenthal & Co. (hereinafter collectively referred to as Rosenthal), seek judicial review of a final order of the Commodity Futures Trading Commission (CFTC) pursuant to § 14(g) of the Commodity Futures Trading Commission Act of 1974 (the 1974 Act), 7 U.S.C. § 18(g). The CFTC found that Rosenthal committed fraud in connection with the sale of six London sugar options to Alfred Hauser in 1976 in violation of § 4c(b) of the 1974 Act, 7 U.S.C. § 6c(b),[1]

---

* The Honorable William R. Collinson, United States Senior District Judge for the Western District of Missouri, sitting by designation.

1. No person shall offer to enter into, enter into, or confirm the execution of, any transaction subject to the provisions of subsection (a) of this section involving any commodity regulated under this chapter, but not specifically set forth in section 2 of this title, prior to October 23, 1974, which is of the character of, or is commonly known to the trade as, an "option," "privilege," "indemnity," "bid," "offer," "put," "call," "advance guaranty,"

and CFTC Rule 32.9, 17 C.F.R. § 32.9,[2] and awarded Hauser reparations in the amount of $24,592.40[3] plus interest and $25.00 in filing fees. *Hauser v. Rosenthal & Co.*, CFTC Docket No. R 77–122 (Sept. 26, 1980).

For reversal Rosenthal argues that (1) the reparations procedure established in § 14 of the 1974 Act, 7 U.S.C. § 18, violates the jury trial guarantee of the seventh amendment, (2) the findings of the CFTC are not supported by substantial evidence, (3) the CFTC erroneously failed to give effect to the customer agreement, and (4) violation of the CFTC's antifraud rule requires proof of scienter.[4]

For the reasons discussed below, we deny the petition for review.

*Facts*

Rosenthal is registered with the CFTC as a futures commission merchant, § 4d of the 1974 Act, 7 U.S.C. § 6d. In mid-March 1976, Nicholas Nutter, a Rosenthal sales representative, made an unsolicited telephone call to Hauser and urged Hauser to purchase London sugar options. According to the CFTC's findings of fact, Nutter told Hauser that Rosenthal analysts predicted a sharp rise in sugar prices in the immediate future, that sugar prices had risen sharply in 1974, and that London options were a good way to invest in sugar. Nutter did not, however, properly explain the risks or mechanics of commodity options trading, that an option does not represent a true equity position in the commodity, or that Hauser could lose his entire investment if the price of sugar did not reach a certain level (enough to cover the premium and any broker commissions). Nutter's sales pitch was nevertheless successful and in March 1976 Hauser purchased two October 1976 London sugar call options for $7,622.40. At this time Rosenthal sent Hauser a customer agreement form, a customer information form, and a commodity account letter. Hauser signed the forms and mailed them back to Rosenthal.

In late May 1976 Nutter again telephoned Hauser and told him that a slight rise in the

---

or "decline guaranty," contrary to any rule, regulation or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe within one year after the effective date of the Commodity Futures Trading Commission Act of 1974 unless the Commission determines and notifies the Senate Committee on Agriculture, Nutrition, and Forestry and the House Committee on Agriculture that is unable to prescribe such terms and conditions within such period of time: *Provided*, That any such order, rule, or regulation may be made only after notice and opportunity for hearing: *And provided further*, That the Commission may set different terms and conditions for different markets.

7 U.S.C. § 6c(b).

2. It shall be unlawful for any person directly or indirectly—

    (a) To cheat or defraud or attempt to cheat or defraud any other person;

    (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

    (c) To deceive or attempt to deceive any other person by any means whatsoever;

in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction.

17 C.F.R. § 32.9. As noted in *CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F.Supp. 911, 914 n.8 (S.D.N.Y.1977),

[a]n antifraud provision substantially identical to Rule 32.9 was adopted by the Commission on an interim basis on June 24, 1975, *see* 40 Fed. Reg. 26,505–06, and was codified as 17 C.F.R. § 30.01. The present rule reflects a section number redesignation and contains some minor language modifications, but was not intended by the Commission to work substantive changes. *See* 41 Fed. Reg. 51,-813 (Nov. 24, 1976).

3. According to the writer's calculations, Hauser's out-of-pocket loss was $24,590.40 ($7,622.40 paid for the first pair of commodity options, $8,437.84 paid for the second pair, $8,530.16 paid for the third pair).

4. Rosenthal also argues that the CFTC improperly scheduled Hauser as a witness in other CFTC proceedings pending against Rosenthal and that a CFTC staff attorney improperly forwarded to Hauser's attorney a deposition taken in other CFTC proceedings. These arguments constitute a general claim by Rosenthal that the CFTC improperly aided Hauser. It is unclear that impropriety was involved in the scheduling of Hauser as a witness in other CFTC proceedings against Rosenthal. The deposition in question was not admitted into evidence.

price of sugar had resulted in a "credit" of about $1,700 in his account. Nutter did not explain that the $1,700 figure did not represent a profit. In early June 1976 Hauser purchased two December 1976 London sugar options for $8,437.84.

In mid-June 1976 Nutter met with Hauser and again referred to the $1,700 credit in Hauser's account. Nutter also stated that the sugar market was going to rise, that his commission per sale was only $80 or $85, and that great profits could be made with little or no risk by trading options.

In early July 1976 Rosenthal mailed Hauser its brochure explaining the risks and mechanics of trading London commodity options. Hauser apparently did not receive the brochure until sometime in August. The date of Hauser's receipt of the brochure was the subject of some dispute. Rosenthal argued that Hauser had received the brochure *before* he purchased a third pair of London sugar call options in mid-August. In early August 1976 Nutter again telephoned Hauser and told him that the price of sugar had declined and that his four options were accordingly showing no gain. Nutter urged Hauser to recoup his losses by making another investment. Hauser purchased two October 1977 London sugar call options in late August 1976 for $8,530.16. Hauser testified that he did not receive Rosenthal's commodity options brochure until after he bought the October 1977 options and that it was only after reading the brochure that he realized that he had lost his investment. The options were worthless when they expired.

Hauser filed a reparation complaint with the CFTC on February 11, 1977. § 14 of the 1974 Act, 7 U.S.C. § 18; *see generally* Rosen, *Reparation Proceedings Under the Commodity Exchange Act*, 27 Emory L.J. 1006 (1978). Administrative hearings were held before an administrative law judge (ALJ) in June 1978. On January 4, 1979, the ALJ issued an initial decision finding Rosenthal committed fraud in connection with the sale of the six London sugar call options to Hauser in violation of § 4c(b) of the 1974 Act, 7 U.S.C. § 6c(b), and CFTC Rule 32.9, 17 C.F.R. § 32.9, by failing to fully disclose the mechanics, costs and risks of commodity options, by misrepresenting the commissions and fees charged, and by making false and misleading statements about the profit potential and risks involved in trading in London commodity options. The ALJ awarded Hauser reparations in the amount of $24,592.40 plus interest (out-of-pocket loss) and $25.00 in filing fees.

Rosenthal sought CFTC review. On September 26, 1980, the CFTC denied the application for review but modified the award of interest. This petition for review followed.

*Commodity Options*

The commodities business operates as a marketplace of contracts. The contracts traded are for the purchase, or sale, of specific amounts of a commodity either that have already been produced, or that will be produced in the future and delivered by a specific date. This latter group of contracts are known as "commodity futures." A "commodity option" is a contractual right to buy, or sell, a commodity or commodity future by some specific date at a specified, fixed price, known as the "striking price." [5] A contract entitling its owner to purchase the commodi-

---

**5.** London options are options on commodity futures contracts; however, "an option can also be written by anyone else willing to take the chance that he will be able to cover his obligation in the futures market, if the option purchaser decides to exercise the option." *British Am. Commodity Options Corp. v. Bagley*, 552 F.2d 482, 485 (2d Cir.), *cert. denied*, 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); *see also CFTC v. J.S. Love & Assocs. Options, Ltd.*, 422 F.Supp. 652, 654 n.6 (S.D.N.Y.1976); *see generally* Lower, *The Regulation of Commodity Options*, 1978 Duke L.J. 1095, 1096 n.3 (hereinafter Lower). "Such options are considered 'naked' in the sense that they are not backed by an actual futures contract or physical inventory held by a member of the exchange, and no margin deposits or segregated premiums were available to insure payment of any gain to the investor." Lower, 1978 Duke L.J. at 1106 (footnote omitted); *see also* Long, *Commodity Options—Revisited*, 25 Drake L.Rev. 75, 82–87 (1975) (discussing the spectacular rise and collapse of Goldstein-Samuelson, Inc. during the early 1970s).

ty is known as a "call," and a contract entitling its owner to sell is called a "put." In the plainest case, an option is created or "written," by the owner of a commodity or commodity futures contract, who commits himself to sell his goods or contract.

*British American Commodity Options Corp. v. Bagley*, 552 F.2d 482, 484–85 (2d Cir.) (footnotes omitted); *cert. denied*, 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977). *See generally* Lower, *The Regulation of Commodity Options*, 1978 Duke L.J. 1095 (hereinafter Lower); *Symposium: Regulation of Commodity Futures Trading*, 27 Emory L.J. 847 (1978); Note, *Recent Developments in Commodities Law*, 37 Wash. & Lee L.Rev. 986 (1980) (hereinafter *Recent Developments*).

The purchaser of a commodity option pays a "premium" to acquire the option; the amount of this charge will vary depending on the duration of the option, market conditions at the time of the purchase and mark-ups in price by intermediary dealers. Brokers or dealers commissions and fees are also paid on both the purchase and exercise of the option. A call option can yield a profit to the investor if the underlying commodity's price rises sufficiently to offset the investor's expenditures on the premium and commissions. When such a point is reached, the investor can exercise the option at the strike price [, the price at which the option purchaser is entitled to buy or sell the underlying commodity or commodity futures contract,] and simultaneously sell at the higher market price the commodity or futures contract that has been acquired. Any proceeds realized beyond the amount of the premium and commissions are the investor's profits. Similarly, a put option can be exercised profitably if the price of the underlying commodity has declined enough to offset expenditures when the commodity or a futures contract covering it is purchased at the market price and simultaneously sold at the higher strike price. If price fluctuations in the underlying commodity are only partially sufficient to offset an investor's expenditures, he may nevertheless recoup a portion of his expenses by exercising his option before the expiration date. Of course, if the option is not exercised before it expires, the investor sacrifices his premium and cannot recoup commissions.

*CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F.Supp. 911, 914 n.6 (S.D.N.Y. 1977). Due to the size of the premium and commissions charged, considerable favorable market price movement is required in order to produce any profit for the customer. "Since the premium paid is a separate payment and does not constitute a credit against the striking price, an option holder will not break even on his investment unless the price of the underlying commodity or futures contract moves favorably by at least the amount of the premium plus commissions." Lower, 1978 Duke L.J. at 1096 n.3. Conversely,

[i]f adverse price changes occur, the option holder merely fails to exercise his option. Unlike the holder of a futures contract, the option holder bears a risk of loss limited to the amount paid as option premium. This limitation of risk, in fact, is the factor that . . . made options very popular with small investors in the 1970s.

*Id.* at 1097 n.3.

At issue here are "London options" or options on futures contracts for certain commodities traded on the commodity exchanges in London, England.[6] *See general-*

---

6. Although option trading proceeded without difficulty on the London exchanges, the image of London options was tarnished by the manner in which they were marketed in this country prior to the 1978 ban on trading. [*See* 43 Fed.Reg. 16,153 (Apr. 17, 1978) (codified in 17 C.F.R. § 32.11 (effective June 1, 1978) and confirmed in § 3 of the Futures Trading Act of 1978, 7 U.S.C. § 6c(c)).]

Since the London exchange members did not have offices in the United States to sell options, American option purchasers were forced to deal with an American brokerage firm. Upon receipt of a customer order, such a firm would contact a member of the appropriate London exchange for the purpose of purchasing an option. That exchange member would then enter into the option contract

*ly* Long, *Commodity Options—Revisited*, 25 Drake L.Rev. 75, 111–15 (1975). "Five of these exchanges handle what are often collectively referred to as the 'soft commodities': wool, cocoa, sugar, coffee and vegetable oil. Futures and option transactions on these exchanges are cleared by a common clearinghouse, known as the International Commodity Clearing House .... " Lower, 1978 Duke L.J. at 1103 n.35. The other two major London commodity exchanges are the London Rubber Exchange and the London Metals Exchange. *Id.* Hauser purchased London sugar options.

*Recent Regulation*

Unfortunately, the relatively low cost and limited risk characteristic of commodity options, the volatility of world commodity prices, the enormous potential for profits, and the absence of regulation attracted the interest of brokers who specialized in the unscrupulous mass-marketing of options to small investors during the 1970s. *See* Lower, 1978 Duke L.J. at 1109–11; *Recent Developments*, 37 Wash. & Lee L.Rev. at 991–97.

> The potential for abuse in the field of option trading created a great deal of pressure for legislation outlawing fraudulent dealings in commodity options. The Commodity Exchange Act, passed in 1936, banned option trading in all domestic commodities within its scope ["old" commodities]. International commodities ["new" commodities] were not covered, however. In 1974 Congress responded by passing the Commodity Futures Trading Commission Act, which created the C.F.T.C. as an independent regulatory body paralleling the Securities and Exchange Commission and broadened the coverage of the 1936 Act. The 1974 Act amended Section 6c(b) to provide that the C.F.T.C. should have broad authority to regulate, through its rule-making powers, commodity options transactions. Pursuant thereto, the C.F.T.C. adopted Rule 32.9 ....

*Kelley v. Carr*, 442 F.Supp. 346, 349 (W.D. Mich.1977) (footnote omitted). The CFTC also adopted antifraud rules requiring disclosure (Rule 32.5, 17 C.F.R. § 32.5), registration of all persons trading in commodity options as "futures commissions merchants" or as "associated persons" (Rule 32.3, 17 C.F.R. § 32.3), and recordkeeping.

> By mid-summer 1977, the Commission had licensed sixty American firms to conduct business in London options under the interim regulations [adopted in November 1976; *see* note 2 *supra*]. However, the task of eliminating abuses in the sale of such options proved more burden-

with another member of his exchange. In most cases, the exchange would require the posting of a margin deposit by the grantor and would hold the purchaser's premium.

The problem for the American customer in these transactions was that the protection of clearinghouse guaranties, together with any margin deposits and segregated premiums, extended only to the exchange member in London and not to the American customer. In the event of a default on the option contract, the customer's only recourse was against the American firm with which he had dealt. Moreover, the American customer paid an amount greater than the premium required to purchase the option in London. In addition to the premium, he also paid commissions, directly or indirectly, to the American broker and to the London broker. In many cases there might have been additional brokers in the chain between the customer and the exchange member who actually bought his option on the London exchange.

It is more accurate to say that what the American customer purchased from his broker was not a London option, but an obligation from the American firm to enter into a contract on the customer's behalf with another broker who was a member of the London exchange, who in turn agreed to enter into an option transaction for the account of the American broker.... Thus, the United States customer had only a contractual obligation from his broker to pay the customer a certain amount of money if the market moved in his favor.... [The customer] was forced to rely upon the solvency of his broker for payment of any gain. If his broker went bankrupt, the customer had no means of recovering from the margin deposits or segregated premiums in London, except as a general creditor of the broker.

Lower, 1978 Duke L.J. at 1104–05 (footnotes omitted). The difficulties faced by the customer and the risks were substantial. *See, e.g.,* *Kelley v. Carr*, 442 F.Supp. 346 (W.D.Mich. 1977) (discussing the giant commodity fraud perpetrated by Lloyd Carr & Co. in London commodity options).

some than had been anticipated. Indeed, rather than diminishing under Commission regulation, the problems and abuses that had plagued commodity options in the early 1970s [i.e. the Goldstein-Samuelson collapse] increased drastically. Perhaps encouraged by the official recognition of London option trading, many new firms, employing rather questionable practices, entered the business during 1976 and 1977. Throughout the months of December 1977 and January 1978, American newspapers were filled with stories of commodity option fraud perpetrated by firms like Lloyd Carr & Co.

... Despite the extensive authority and powers given to the CFTC in 1974 to deal with deceptive sales practices and fraudulent transactions attributed to firms like Lloyd Carr, commodity option sales presented a *regulatory problem of major proportions* for the CFTC. Although the Commission managed to obtain injunctions against fifty-five commodity option firms and individuals and takes credit for putting fourteen companies out of business, it approached 1978 congressional oversight hearings with a dismal record for protecting the public.[7] Quite simply, the commodity option industry had grown to a size that the fledgling Commission could not control.

Lower, 1978 Duke L.J. at 1112–13 (footnotes omitted); *see also* S.Rep.No.95–850, 95th Cong., 2d Sess. 14, 24, *reprinted in* [1978] U.S. Code Cong. & Ad. News 2087, 2112 ("the offer and sale of commodity options in the United States is fraught with fraud and. other illegal and unsound practices and represents substantial risks to members of the general public").

The Commission determined in 1978 that [the antifraud] rules were not sufficient to regulate the sale of commodity options, because fraud in the industry was, as Congress had found earlier, still deeply entrenched and pervasive and posed substantial risks to the general public. Thus it issued Rule 32.11, which made it unlawful after June 1, 1978 "for any person to solicit or accept money, securities or property in connection with, the purchase or sale of any commodity option, or to supervise any person or persons so engaged." Congress, in amending the Commodity [Exchange] Act in 1978, confirmed the Commission's approach, codifying Rule 32.11 in section 4c(c) of the [Commodity Exchange Act, as amended, 7 U.S.C. § 6c(c)], which prohibits all trading in options except sales to persons who in their regular business buy, sell, produce, or otherwise use that commodity or sales by persons granted exemptions by the CFTC pursuant to its regulations.[8] Thus, unless exempted by the Commission, the offer or sale of any commodity option is proscribed both under the 1978 amendment of the [Commodity Exchange] Act and Rule 32.11.

*CFTC v. U.S. Metals Depository Co.*, 468 F.Supp. 1149, 1153 (S.D.N.Y.1978) (footnotes omitted); *see also* Lower, 1978 Duke L.J. at 1114–16.

This review of the increased regulation and eventual prohibition of commodity options trading provides a background for Hauser's transactions. Thus, at the time Hauser purchased the six London sugar options (in March, June and August 1976), options transactions in the "new" or international commodities like sugar were subject to general antifraud rules, including Rule 32.9 (17 C.F.R. § 32.9).[9] · *See* § 4c(b)

---

**7.** Under § 101(b) of the 1974 Act, 7 U.S.C. § 16(d), the CFTC was funded for four fiscal years (ending June 30, 1978). Following Senate and House hearings in 1978, the funding authorization for the CFTC was extended and the 1974 Act was amended. Futures Trading Act of 1978, Pub.L.No.95–405, 92 Stat. 865 (1978).

**8.** *See* Rules 32.4, .12 (17 C.F.R. § 32.4, .12).

**9.** On April 25, 1975, soon after the Commission came into official existence, it published for public comment a proposed anti-fraud rule, 40 Fed.Reg. 18187 (1975) .... The anti-fraud rule became effective June 24, 1975. The Commission explained that its swift action was necessary because the [1974] Act's grant of exclusive jurisdiction to the Commission had left the public without regulatory protection.

of the 1974 Act, 7 U.S.C. § 6c(b) (prohibiting options transactions in violation of any CFTC rule, regulation or order). The 1974 Act granted the CFTC plenary authority "to make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of this chapter." *Id.* § 8a(5), 7 U.S.C. § 12a(5).

*Reparations Proceedings—Seventh Amendment*

■ In addition to establishing the CFTC and granting it broad rulemaking authority over commodity futures and commodity options trading in the 1974 Act,

> Congress also sought to encourage inexpensive and expeditious adjudication of customer claims against commodity professionals by requiring the CFTC to establish a reparation procedure for the resolution of claims arising under the Act. The reparation procedure was intended to be a new remedy for aggrieved customers in addition to litigation in the courts and arbitration. *See* Rosen, *Reparation Proceedings Under the Commodity Exchange Act*, 27 Emory L.J. 1005, 1005 (1978). "The 1974 legislation envisioned the Commission's reparations proceedings as being analogous to the operation of a small claims court," in which a customer, often representing himself *pro se*, could obtain satisfaction of his claim. S.Rep. No.95–850, 95th Cong., 2d Sess. 16, *reprinted in* [1978] U.S. Code Cong. & Ad. News 2087, 2104. Unfortunately, the goal of providing "a fast, efficient, nontechnical forum," Rosen, *supra*, at 1055, has been hampered, at least in part, by the increasing number of reparation claims that have been filed with the Commission. *Id.*; S.Rep.No.95–850, 95th Cong., 2d Sess. 16, *reprinted in* [1978] U.S. Code Cong. & Ad. News 2087, 2104.

The procedure in reparation cases before the CFTC is established in [§ 14 of the 1974 Act,] 7 U.S.C. § 18. CFTC rules

promulgated under that section are found in 17 C.F.R. § 12.1–.102 (1979). Under the Act, any person may file a complaint with the CFTC alleging a violation of the Act or of CFTC rules, regulations or orders. 7 U.S.C. § 18(a). The Commission is empowered to investigate the complaint, *id.* § 18(b), and if [the CFTC's Enforcement Division] determines that the complaint states a violation of the Act, require the accused commodity professional to file an answer. If the claim is not then settled, the case is referred to an Administrative Law Judge for a formal adjudicatory proceeding.

The Commission's role in these proceedings is to provide a forum for the resolution of claims arising out of trading in commodity futures [and commodity options, at least prior to 1978] .... It apparently does not assume a prosecutorial role in formal adjudicatory proceedings or represent complainants in asserting their claims for damages. [Brief of CFTC at 8–9.] In general, complainants must either retain private counsel or represent themselves before the ALJ and in any subsequent stages of the reparation proceedings.

A hearing presided over by the ALJ is held on the complaint upon referral. Under the Commission's regulations, the ALJ renders an initial decision, 17 C.F.R. § 12.84 (1979), which becomes the final order of the Commission unless an application for review by the CFTC is filed within 15 days of the service of the initial decision or the CFTC decides to review the ALJ's decision *sua sponte.* The CFTC may decline review or grant the appeal and render its own decision. In either event, if a violation of the Act and damages are finally found, the Commission's order directs the offender to pay the amount of his damages. 7 U.S.C. § 18(e). An order directing payment can be enforced by the complainant in the

*British Am. Commodity Options Corp. v. Bagley,* 552 F.2d at 486. *But cf. Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 567 F.2d 1174, 1177 (2d Cir. 1977) (applying CFTC arbitration regulations retroactively, that is, to circumstances predating Nov. 29, 1976); *Rothberg v. Loeb, Rhoades & Co.,* 445 F.Supp. 1336, 1340 (S.D.N.Y.1978) (same).

federal district courts, 7 U.S.C. § 18(f), and a commodity professional's failure to pay results in loss of trading privileges, id. § 18(h). Review of CFTC reparation orders is by petition to the court of appeals pursuant to 7 U.S.C. § 18(g).

*Rosenthal & Co. v. CFTC*, 614 F.2d 1121, 1123–24 (7th Cir. 1980) (footnotes omitted).[10] Review in the court of appeals is conditioned upon the filing of a bond for double the amount of the reparations award. 7 U.S.C. § 18(g). The prevailing party is also entitled a reasonable attorney's fee. *Id.*

Rosenthal argues that the reparations procedure violates the seventh amendment, which provides in part that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. "The phrase 'Suits at common law' has been construed to refer to cases tried prior to the adoption of the Seventh Amendment in courts of law in which jury trial was customary as distinguished from courts of equity or admiralty in which jury trial was not." *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 449, 97 S.Ct. 1261, 1266, 51 L.Ed.2d 464 (1977). Rosenthal characterizes the reparations proceeding as essentially a private action for money damages and argues that the administrative adjudication of such claims, in the absence of a *de novo* hearing before a jury in federal district court prior to enforcement, deprives Rosenthal of the right to jury trial.[11] Rosenthal also argues that administrative adjudication violates its right under Article III of the Constitution to have reparations claims heard and determined in a judicial forum.

This is an interesting argument.[12] Rosenthal raised this argument several years ago in the context of an action for declaratory and injunctive relief in federal district court. The district court held that because no final agency action had been taken at that time against Rosenthal in the pending

**10.** *Compare Witzel v. Chartered Sys. Corp.*, 490 F.Supp. 343, 347 (D.Minn.1980) (implied private right of action for commodity options customer allegedly defrauded), *with Stone v. Saxon & Windsor Group, Ltd.*, 485 F.Supp. 1212 (N.D.Ill.1980) (no implied private right of action). *See also* Note, *Recent Developments in Commodities Law*, 37 Wash. & Lee L.Rev. 986, 995–1016 (1980) (arguing there is no implied private right of action under the 1974 Act and the 1978 amendments in light of the express statutory remedial protections now afforded producers, consumers and investors). *Compare Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980), *cert. granted*, 450 U.S. 910, 101 S.Ct. 1346, 67 L.Ed.2d 332 (1981) (finding implied private right of action in favor of commodities futures customers), *and Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216 (6th Cir. 1980), *cert. granted*, 451 U.S. 906, 101 S.Ct. 1971, 68 L.Ed.2d 293 (1981) (same), *with Rivers v. Rosenthal & Co.*, 634 F.2d 774 (5th Cir. 1980), *pet. for cert. filed*, 50 U.S.L.W. 3079 (Mar. 10, 1981) (no implied private right of action for commodities futures customers). Fortunately, this issue is not before us.

**11.** Under the House bill (H.R. 13113, 93d Cong., 2d Sess. (1974)) judicial review of CFTC orders would have been *de novo* (findings of fact and orders would have been prima facie evidence of the facts stated therein). This was rejected in conference. *See* H.Conf.Rep.No.93–1383, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S. Code Cong. & Ad. News 5843, 5894, 5896. Rosenthal also argues that the reparations procedure is unconstitutional because the 1974 Act, as amended, and CFTC regulations authorize the disposition of claims for less than $5,000 by summary procedures (submission of written materials, no oral hearing). § 14(b) of the 1974 Act, as amended by the Futures Trading Act of 1978 (increasing the amount-in-controversy requirement for oral hearings from $2,500 to $5,000), 7 U.S.C. § 18(b); 17 C.F.R. § 12.-71(a), .91–.95. Rosenthal argues that the summary procedure necessarily precludes cross-examination of the witnesses because the claims are tried on the basis of verified statements, documents and depositions. We do not reach this claim because the amount in controversy in the present case exceeded the statutory minimum and was referred to an ALJ for a hearing.

**12.** The CFTC argues that Rosenthal did not raise the jury trial issue in its application for review before the CFTC and has therefore waived judicial review of the issue. However, as noted by the CFTC in its brief (Brief for CFTC at 18 n.22), the CFTC has declined to pass on this constitutional issue. *See, e.g., Chicoine v. Rosenthal & Co.*, 2 Comm.Fut.L. Rep. (CCH) ¶ 21,075, at 24,345 (1980) (indicating that the respondent should seek resolution of the jury trial question in a court of appeals), *appeal pending sub nom. Myron v. CFTC*, Nos. 80–1951, 80–2259 (7th Cir.).

reparation proceedings, the seventh amendment challenge was premature and could be pursued later in the court of appeals under § 14(g) of the 1974 Act, 7 U.S.C. § 18(g) (judicial review). This holding was affirmed on appeal. *Rosenthal & Co. v. Bagley*, 581 F.2d 1258, 1260–61 (7th Cir. 1978), aff'g [1977–80 Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶ 20,506 at 22,096 (N.D.Ill. Apr. 28, 1977). The *Bagley* court reviewed the reparations procedure and concluded that the seventh amendment challenge was "arguable but far from clear." [13] 581 F.2d at 1261. The court noted that *Atlas Roofing* supported the administrative adjudication of reparation claims [14] and also rejected a similar Article III argument.[15] *Id.*

We too think that *Atlas Roofing* refutes Rosenthal's seventh amendment challenge. At issue in *Atlas Roofing* was whether Congress could, consistent with the seventh amendment, create a new cause of action in the government for civil penalties enforceable in an administrative agency where there is no provision for jury trial. The Court reexamined the relevant cases and held that

> there is little or no basis for concluding that the [Seventh] Amendment should now be interpreted to provide an impenetrable barrier to administrative factfinding under otherwise valid federal regulatory statutes. We cannot conclude that the Amendment rendered Congress powerless—when it concluded that remedies available in courts of law were inadequate to cope with a problem within Congress' power to regulate—to create new

public rights and remedies by statute and commit their enforcement, if it chose, to a tribunal other than a court of law— such as an administrative agency—in which facts are not found by juries.

430 U.S. at 460, 97 S.Ct. at 1271.

*Atlas Roofing* reaffirmed a distinction drawn in several earlier cases between statutory or administrative proceedings and suits at common law or proceedings in the nature of suits at common law. *See Rogers v. Loether*, 467 F.2d 1110, 1115–16 (7th Cir. 1972), aff'd sub nom. *Curtis v. Loether*, 415 U.S. 189, 194–96, 94 S.Ct. 1005, 1008–09, 39 L.Ed.2d 260 (1974); *see also Pernell v. Southall Realty Co.*, 416 U.S. 363, 383, 94 S.Ct. 1723, 1733, 40 L.Ed.2d 198 (1974); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *Block v. Hirsh*, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921). As stated in *Curtis v. Loether*,

> [t]he Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law.
>
> ... *Jones & Laughlin* merely stands for the proposition that the Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication and would substantially interfere with the [administrative agency's] role in the statutory scheme.... [Congress has the] power to entrust enforcement of statutory rights to an administrative

---

13. In view of its holding that judicial intervention before final agency action should occur only where agency action would violate a "clear right" of the moving party, the court discussed the seventh amendment challenge in those terms. *Rosenthal & Co. v. Bagley*, 581 F.2d 1258, 1261 (7th Cir. 1978).

14. At least when only "public rights" are involved, Congress may provide for administrative fact finding, with which a jury trial would be incompatible. And the fact that new statutory "public rights" are enforceable in favor of a private party does not mean they cannot be committed to an administrative agency for determination. Moreover, "the right to a jury trial turns not solely on

the nature of the issue to be resolved but also on the forum in which it is to be resolved."

... [P]laintiff [Rosenthal & Co.] also argues that § 14(a) violates a right conferred by Article III of the Constitution to have the reparations claims against it determined exclusively in a judicial forum. Congress' power to commit statutorily created claims to administrative agencies for initial determination has repeatedly been recognized.

*Id.*, citing *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 450–61, 97 S.Ct. 1261, 1266–72, 51 L.Ed.2d 464 (1977).

15. *See* note 14 *supra*.

process or specialized court of equity free from the strictures of the Seventh Amendment. But when Congress provides for enforcement of statutory rights in an ordinary civil action in the district courts, where there is obviously no functional justification for denying the jury trial right, a jury trial must be available if the action involves rights and remedies of the sort typically enforced in an action at law.

415 U.S. at 194–95, 94 S.Ct. at 1008–09 (footnotes omitted).

Fortunately, we need not engage in difficult (and often inconclusive) historical analysis in order to determine whether the reparations procedure is an action to enforce legal or equitable rights. *See, e.g., United States v. One 1976 Mercedes Benz 280S*, 618 F.2d 453 (7th Cir. 1980) (discussion of historical origins of forfeiture proceeding); *see also* 9 C. Wright & A. Miller, Federal Practice and Procedure §§ 2302, 2311 (1971). Even if the reparations claim could be characterized historically as a legal issue, "the right to a jury trial turns not solely on the nature of the issue to be resolved but also on the forum in which it is to be resolved." *Atlas Roofing Co.*, 430 U.S. at 461, 97 S.Ct. at 1272 (footnote omitted). Here, Congress has created a comprehensive statutory scheme to address widespread fraud in the commodity options industry. Congress in the 1974 Act created new statutory rights and remedies and entrusted their enforcement, at least with respect to reparations,[16] to an administrative agency. We hold that the reparations procedure does not violate the seventh amendment. *See id.* at 460, 97 S.Ct. at 1271; *see also Pernell v. Southall Realty Co.*, 416 U.S. at 383, 94 S.Ct. at 1733.

■ We are not persuaded by Rosenthal's argument that the right to jury trial should not depend upon the forum. Rosenthal argues that if Congress can evade the jury trial requirement by simply designating enforcement to an administrative forum, the seventh amendment is meaningless. This argument was answered in *Atlas Roofing*, where the Court stated that "[t]he Seventh Amendment prevents Congress from depriving a litigant of a jury trial in a 'legal' action before a tribunal customarily utilizing a jury as its factfinding arm, ... and this court has the final decision on the question whether a jury is required." 430 U.S. at 461 n.16, 97 S.Ct. at 1272 n.16. Here, the court of appeals makes the initial decision on this issue. Thus, the courts, not Congress, determine the applicability of the seventh amendment. Moreover, the amendment has not been rendered meaningless because the Court has decided that it is "generally inapplicable" to administrative or statutory proceedings. *See Curtis v. Loether*, 415 U.S. at 194, 94 S.Ct. at 1008, *citing NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. at 47–49, 57 S.Ct. at 629–630. "It is curious that while the Court was granting such a broad exemption for administrative adjudications it was enlarging the area of court cases where the jury would be available ... [by reevaluating] the scope of equitable jurisdiction in view of the expansion of legal rights provided by the Federal Rules of Civil Procedure." *Frank Irey, Jr., Inc. v. OSHRC*, 519 F.2d 1200, 1218 (3d Cir. 1975) (banc), *aff'd sub nom. Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *see Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1971) (jury trial in stockholder's derivative suit); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (jury trial on legal issues could not be withheld because the suit also included equitable claims which under past practice would have been adjudicated under "cleanup" doctrine); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

■ Rosenthal also argues the reparations procedure is in reality a private dis-

16. Nor do we have to decide whether the reparations procedure supplements or replaces the implied private right of action recognized under the Commodity Exchange Act before the 1974 amendments. *See* note 10 *supra*. Assuming an implied private right of action exists under the 1974 Act and involves "legal" rights and remedies, the action would be brought in federal district court where a jury would be available upon demand.

pute and does not involve "public rights." "In cases which do involve only 'private rights,' [the Supreme] Court has accepted factfinding by an administrative agency, without intervention by a jury, only as an adjunct to an Art. III court, analogizing the agency to a jury or a special master and permitting it in admiralty cases to perform the function of the special master." *Atlas Roofing Co.*, 430 U.S. at 450 n.7, 97 S.Ct. at 1266 n.7, *citing Crowell v. Benson*, 285 U.S. 22, 51–65, 52 S.Ct. 285, 292–298, 76 L.Ed. 598 (1932). We do not think the present litigation involves purely private rights. The present case is not one "in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact," *Atlas Roofing Co.*, 430 U.S. at 450, 97 S.Ct. at 1266; the CFTC, although a respondent in the petition for judicial review now before us, did not sue Rosenthal for reparations. The present case, however, is one in which "the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights." *Id.* at 458, 97 S.Ct. at 1270. Congress, acting under the commerce clause, has regulated commodity options transactions. The case is in a functional sense one between the government and the commodity options broker, the party subject to government regulation. The customer does receive a benefit in the form of a reparations award. However, the fact that the statute and regulations are enforceable in favor of a private party does not preclude administrative adjudication. *Id.* at 452, 97 S.Ct. at 1267, *citing Crowell v. Benson*, 285 U.S. at 51–52, 52 S.Ct. at 292–293; *see Block v. Hirsh*, 256

U.S. at 158, 41 S.Ct. at 460; *Rosenthal & Co. v. Bagley*, 581 F.2d at 1261.

*Sufficiency of the Evidence*

■ Rosenthal next argues that the CFTC's decision is not supported by the evidence. 7 U.S.C. § 9.[17] We have carefully reviewed the record and conclude that the decision is supported by the evidence and that therefore the findings therein are conclusive. We note that many of the challenged findings depended upon credibility determinations, particularly with respect to misrepresentations and omissions made by Nutter to Hauser. The ALJ evidently found Hauser a more credible witness than Nutter.

Rosenthal first argues that the finding (# 12) that neither Nutter nor Rosenthal had any knowledge of Hauser's financial condition is clearly erroneous. The record indicates that Nutter initially telephoned ("cold call") Hauser on the basis of a "lead" supplied by Dunn & Bradstreet; at that time Nutter knew nothing about Hauser or his financial condition.

Rosenthal also argues that this finding was improperly used as the basis for a "suitability" standard. Because the CFTC apparently has not developed any suitability standard for commodity options trading, the violation could not properly depend upon any finding that Hauser was not a financially or otherwise suitable customer for commodity options trading. This argument was rejected by the CFTC, which characterized the ALJ's references to suitability as extraneous to the finding that Ro-

---

17. Unlike most other legislation providing for judicial review of agency decision, the Commodity Exchange Act (as carried forward by the Commodity Futures Trading Commission Act) declares that "the findings of the Commission as to the facts, if supported by the weight of evidence, shall ... be conclusive." 7 U.S.C. § 9. The "weight of evidence" means "the preponderance" or "greater weight of the evidence," but the court's function "is something other than that of mechanically reweighing the evidence to ascertain in which direction it preponderates; it is rather to review the record with the purpose of determining whether the finder of

fact was justified, *i.e.*, acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported [the] findings." *Haltmier v. CFTC*, 554 F.2d 556, 560 (2d Cir. 1977), *citing Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163–64 (8th Cir. 1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972); *Kent v. Hardin*, 425 F.2d 1346, 1349 (5th Cir. 1970); *Great W. Food Distribs., Inc. v. Brannan*, 201 F.2d 476, 479–80 (7th Cir.), *cert. denied*, 345 U.S. 997, 73 S.Ct. 1140, 97 L.Ed. 1404 (1953).

senthal and Nutter violated the antifraud rule. We agree with the CFTC that Rosenthal's liability was not premised upon violation of a nonexistent suitability standard but upon material misrepresentations and omissions.

Rosenthal next argues that the finding ( # 14) that Nutter told Hauser that Rosenthal's analysts predicted a sharp rise in sugar prices in the immediate future is not supported by the specific transcript page cited by the ALJ.[18] However, as noted by the CFTC, this finding is supported elsewhere in the record. Hauser testified that Nutter told him that Rosenthal's analysts predicted sugar would increase in price in the immediate future (tr. at 6–8).

Rosenthal next argues that certain findings about Nutter's failure to explain the actual risks, costs and mechanics of commodity options trading to Hauser [19] and about the mailing of the brochure [20] are not supported by the evidence. Rosenthal does not dispute the findings that Nutter failed to explain the nature of commodity options but argues that its brochure, which Rosenthal argues was mailed to Hauser in March 1976, fully and clearly disclosed the actual risks, costs and mechanics of commodity options trading. Rosenthal also argues that the ALJ improperly failed to give appropriate consideration to Hauser's successful farming career and experience in trading commodity futures.

We do not agree. Nutter did testify that he mailed or instructed another Rosenthal employee to mail the brochure to Hauser in March 1976 after the initial telephone contract. However, the Rosenthal employee responsible for handling customer mailing testified that the brochure was not mailed to Hauser until after July 1, 1976. Hauser testified that he did not receive the brochure until late August 1976. Evidently he did not actually receive the brochure until that time because he had been on vacation. The issues about the timing of the mailing and receipt of the brochure were resolved against Rosenthal; the record supports these findings. Even assuming the brochure adequately disclosed the risks and costs of commodity options trading, disclosure *following* the sale of the commodity options constitutes no disclosure at all and would not cure or correct the misrepresentations made by Nutter.[21] *See, e.g., CFTC v. U. S. Metals Depository Co.*, 468 F.Supp. at 1060. Further, Hauser's success as a farmer and his experience in the commodity futures market cannot justify Rosenthal's failure to disclose or Nutter's misrepresentations and omissions. Although commodity options are often related to underlying commodity futures contracts, trading in options is much more speculative and sophisticated investment than trading in futures. *See generally* Lower, 1978 Duke L.J. 1095; *Recent Developments*, 37 Wash. & Lee L.Rev. 986.

18. Rosenthal argues that Nutter's testimony was only to the effect that, as interpreted by Rosenthal's analysts, the economic information then available *indicated* that sugar prices would rise.

19. Findings # # 16–23 (that Nutter did not explain the nature of options trading or the mechanics of options trading, what the striking price is, that an option does not represent an equity position, that there is no secondary or resale market for London options, what the "break even" point would be, that the premium was only the price of the option and not the underlying future or commodity, and that Rosenthal would charge a "foreign service fee" or disclose the amount of his commission or the foreign service fee or the allocation of the price charged).

20. Findings # # 34–35 (that Rosenthal did not mail the explanatory London options brochure until sometime in July 1976, that Hauser did not receive the brochure until sometime in August 1976).

21. The ALJ further found that Nutter had made several deceptive statements in his sales pitch to Hauser (Nutter minimized the risk involved in commodity options investment, made misleading representations of the profit potential, misrepresented his commissions (he actually received more than 10% of the premium in commissions)) and that the account statements provided by Rosenthal did not clearly and consistently allocate the amounts paid to premium, commission and service fees.

*Customer Agreement*

■ Rosenthal next argues that the CFTC failed to give appropriate effect to the customer agreement, signed by Hauser, which provides in part:

> I am willing and able to assume the financial risks and other hazards of commodity trading and in consideration of your carrying this account for me, I agree that I will in no way hold Rosenthal & Co. responsible for losses incurred to the undersigned from its trading recommendations or suggestions.[22]

Rosenthal argues that the customer agreement thus waives any claim for customer losses due to "losing trading advice." We cannot accept Rosenthal's characterization of Nutter's misrepresentations as mere "losing trading advice." Further, Rosenthal cannot use the customer agreement· as a contractual shield against valid federal regulation and liability for violation of such regulation, *cf. Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 567 F.2d 1174, 1180 (2d Cir. 1977) (arbitration agreements), *citing Fleming v. Rhodes,* 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368 (1947), or as an "advance exoneration of contemplated fraudulent conduct," *CFTC v. U.S. Metals Depository Co.,* 468 F.Supp. at 1161. In addition, the limitation of liability clause in the customer agreement is an adhesive term. *Id.* at 1161 n.44.

*Scienter Required under Rule 32.9*

■ Rosenthal next argues that in order . to establish a violation of Rule 32.9, Hauser must prove scienter[23] and that Hauser failed to establish the required willful or intentional misconduct.[24] The CFTC argues that the question whether scienter is an element of a violation of Rule 32.9 was not raised by Rosenthal in its application for review before the CFTC and that this court should decline to review the question. We have carefully examined the application for review and have read each issue liberally. We find the CFTC's point well taken.[25]

---

**22.** Rosenthal also relies upon the following clause as a waiver of liability:

> Communications may be sent to the undersigned at the address of the undersigned given below, or at such other address as the undersigned may hereafter give you in writing, and all communications so sent, whether by mail, telegraph, messenger or otherwise, shall be deemed given to the undersigned personally, whether actually received or not.

**23.** The Supreme Court defined "scienter" as "a mental state embracing intent to deceive, manipulate, or defraud," in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n.12, 96 S.Ct. 1375, 1381 n.12, 47 L.Ed.2d 668 (1976).

**24.** Rosenthal also argues that the alleged misrepresentations were not material and did not cause the loss. Rosenthal argues that the market information about a future rise in sugar prices was accurate and truthful, that Hauser relied on this information in deciding to enter the market, and that the lack of movement in the price of sugar caused Hauser's loss.

**25.** Several cases have held that scienter is *not* an element of a violation of Rule 32.9. *See CFTC v. Sterling Capital Co.,* 2 Comm.Fut.L. Rep. (CCH) ¶ 21,170, at 24,788 (N.D.Ga. Apr. 13, 1981); *CFTC v. U.S. Metals Depository Co.,* 468 F.Supp. at 1162 n.55; *CFTC v. J.S. Love & Assocs. Options, Ltd.,* 422 F.Supp. at 658–59. Rule 32.9 was promulgated pursuant to the authority granted the CFTC under § 4c(b) of the 1974 Act, 7 U.S.C. § 6c(b), which does not impose any substantive restrictions on CFTC regulation of commodity *options* trading, and *not* pursuant to § 4b of the 1974 Act, 7 U.S.C. § 6b, which has been interpreted to require willful or intentional action. *See CFTC v. Savage,* 611 F.2d 270, 283–84 (9th Cir. 1979) (§§ 4b, 4c(a) of the 1974 Act, 7 U.S.C. §§ 6b, 6c(a), require scienter); *Master Commodities, Inc. v. Texas Cattle Management Co.,* 586 F.2d 1352, 1355–57 (10th Cir. 1978) (§ 6b); *Silverman v. CFTC,* 549 F.2d 28, 31 (7th Cir. 1977) (§ 6b); *Haltmier v. CFTC,* 554 F.2d at 562 (§ 6b). Under § 4b of the Act, 7 U.S.C. § 6b, commodity professionals cannot "cheat or defraud or attempt to cheat or defraud" any person in connection with certain commodity sales or commodities *futures contracts* or "willfully to make or cause to be made to such other person any false report or statement" or "willfully to deceive or attempt to deceive such other person by any means whatsoever" in regard to such orders, contracts, or acts performed with regard to such orders or contracts. In addition to the difference between the treatment of trading in commodity options and commodity futures in the statutory scheme, the regulatory history indicates that the CFTC, in adopting Rule 32.9, did not use the concept of willful behavior reflected in the language of § 4b of the Act, 7 U.S.C. § 6b, and sought to distinguish two cases which had required proof of scienter to establish a violation. 40 Fed.Reg. 26,504, 26,505 & n.2 (1975).

In sum, we conclude that the seventh amendment does not require jury trial upon demand in reparation proceedings before the CFTC, the CFTC's findings are supported by the weight of evidence and therefore conclusive, and the customer agreement does not effectively shield Rosenthal from liability. Accordingly, we deny the petition for review.

Michael J. Esler, Esler & Schneider, Portland, Or., for petitioners.

Ernest J. Isenstadt, F.T.C., Washington, D.C., for respondent.

Before GOODWIN, KENNEDY and ALARCON, Circuit Judges.

The ALJ's initial decision refers several times to § 4b of the Act. We think that this reflects a typographical error. The facts and analysis involve the regulation of commodity options trading, which is the subject of § 4c(b) of the Act, 7 U.S.C. § 6c(b).